**Donald M. OGILVIE, Appellee,**

v.

**FOTOMAT CORPORATION, Appellant.**

**GRIESEDIECK ENTERPRISES, NO. 1, INC., et al., Appellees,**

v.

**FOTOMAT CORPORATION, Appellant.**

**Donald M. OGILVIE, Appellant,**

v.

**FOTOMAT CORPORATION, Appellee.**

**GRIESEDIECK ENTERPRISES, NO. 1, INC. et al., Appellants,**

v.

**FOTOMAT CORPORATION, Appellee.**

**Nos. 80–1064, 80–1065.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1980.

Decided Feb. 18, 1981.

Rehearing and Rehearing En Banc Denied March 16, 1981.

---

E. Barrett Prettyman, Jr., Hogan & Hartson, Washington, D. C., James O. Sullivan, Allan J. Reniche, Robert H. Plaxico, Sullivan, Jones & Archer, San Diego, Cal., Martin J. Purcell, Morris J. Nunn, Morrison, Hecker, Curtis, Krider & Parrish, Kansas City, Mo., for appellant.

Warren E. Slagle, Richard F. Adams, John J. Williams, III, George M. Bock, Slagle &

Bernard, Kansas City, Mo., Edward H. Tenney, Jr., Tenney, Dahman & Katcher, St. Louis, Mo., for appellee.

Before LAY, Chief Judge, and BRIGHT and McMILLIAN, Circuit Judges.

BRIGHT, Circuit Judge.

Donald M. Ogilvie and ten corporations owned by Alvin Griesedieck, Jr. (appellees), franchisees of Fotomat Corporation (Fotomat), brought these consolidated actions against Fotomat, alleging claims arising under federal antitrust statutes as well as Missouri fraud and contracts law. In their complaints, appellees alleged, *inter alia*, that Fotomat fraudulently induced them to enter into franchise agreements and that Fotomat unlawfully conspired with its wholly owned subsidiary, Fotomat Labs, Inc. (Fotomat Labs), to restrain trade by eliminating them as competitors. The jury returned verdicts in favor of appellees on these and other claims following a six-week trial. The district court thereafter eliminated certain damage awards as duplicative, reduced the jury's fraud awards as excessive, and entered judgments on the jury verdicts as modified.

On appeal Fotomat argues for reversal of the fraud and antitrust conspiracy judgments, as well as for a reduction of damages and attorneys' fees. We agree in part with appellant. For the reasons set forth below, we affirm the fraud judgments and reverse the antitrust conspiracy judgments. We also order a reduction of the jury's punitive damage awards and remand for recomputation of attorneys' fees. Appellees in their cross-appeal assert that the district court erred in refusing an injunction on their antitrust claims. We affirm the denial of the injunction.

I. *Background.*

Fotomat and its franchisees sell photographic film, film processing services and related products through small, freestanding stores or kiosks usually located in the parking lots of shopping centers.[1] In April 1967, Fotomat opened its first company-owned stores and began marketing franchises to operate similar retail outlets.[2]

In the summer of 1968, Donald Ogilvie and Alvin Griesedieck, responding to Fotomat's solicitations, both participated in sales presentations with Fotomat representatives.[3] Ogilvie executed a master franchise agreement with Fotomat in August 1968. In January 1969, Griesedieck similarly signed a master agreement. Ogilvie agreed to purchase five franchises from Fotomat to be located in metropolitan Kansas City for a price of $105,000; Griesedieck agreed to purchase twenty franchises in metropolitan St. Louis at a price of $420,000.[4] Under the master franchise agreements, Fotomat required Ogilvie and Griesedieck to execute standard franchise and lease agreements for each store.[5]

1. Judge Pell, writing for the Seventh Circuit, recounted the similar factual background in greater detail in *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980).

2. The record reveals that Fotomat intended from the outset to secure retail bases throughout the United States simultaneously and to "blitz the industry" by obtaining prime locations as soon as possible. Fotomat hoped to establish consumer awareness of the company and an image as the country's preeminent drive-through photofinisher. Because Fotomat was insufficiently capitalized to achieve these objectives by itself, however, it initially resorted to franchising, and actively sought the sale of franchises, in addition to opening company-owned stores. By 1971, 680 company-owned and 355 franchise stores operated throughout the country.

3. At these sales presentations, Fotomat stated that it would sell the film processing, film and merchandise necessary to operate a franchise at the same price Fotomat paid its suppliers, with "no mark-up, no minimums, no delivery cost." Fotomat also stressed the importance of the franchisees' achieving a high sales volume because Fotomat did not break even through royalty and franchise fees until a store reached an annual sales volume of $60,000. Because of the importance of high volume, Fotomat represented that franchise stores would have a protected marketing area within a radius of approximately one mile. Fotomat estimated that the potential annual gross sales of each store would be between $60,000 (described as "modest") and $150,000 (described as "high") and avowed that it would select sites for the franchisees on the basis of sophisticated demographic studies.

4. Consistent with the terms of the master franchise agreement, Griesedieck assigned his contractual interest to 10 separate corporations, Griesedieck Enterprises No. 1, Inc. through No. 10, Inc. Each of these corporations ultimately became a Fotomat franchisee operating two kiosks.

5. The standard agreements gave the franchisee the right to use Fotomat's name, trademark and merchandising concept at specific locations. The initial term of the franchise agree-

The standard franchise agreements required appellees to purchase all merchandise, film processing services, and other services from Fotomat.[6] The agreements also provided that Fotomat would sell film and film processing to appellees "at [Fotomat's] cost without any markup whatsoever." An express condition of the franchise agreements required appellees to continue as lessees of Fotomat kiosks, with the terms of the lease referenced and tied to the standard franchise agreements.

By summer 1969, Fotomat concluded that its earnings from company-owned stores were markedly greater than from franchised stores. Thereafter, Fotomat sold franchises only to fulfill pre-existing commitments. In 1971, Fotomat named a new "franchise relations" director with instructions to "work himself out of a job" through the reacquisition of franchises.

Fotomat, as part of "an aggressive build program" in Kansas City and St. Louis, began overlapping the marketing areas of franchise stores.[7] In September 1972, Fotomat started to overlap eleven of the Griesedieck stores and five of the Ogilvie stores.[8]

Appellees brought these actions in September 1975. In their complaints they alleged, *inter alia*, that Fotomat breached its promise to sell products and services at cost; that Fotomat fraudulently induced them to enter into franchise and lease agreements by representing that it would sell products and services at cost; that Fotomat imposed illegal tying arrangements, by requiring, as a condition on the sale of Fotomat franchises, the purchase of merchandise, services, and film developing, and the lease of real estate, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and section 3 of the Clayton Act, 15

U.S.C. § 14 (1976); that Fotomat conspired with Fotomat Labs to eliminate the plaintiffs as competitors, in violation of section 1 of the Sherman Act; and that Fotomat attempted to monopolize the drive-through retail film and film processing market, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (1976).

The jury returned verdicts in favor of appellees on their tying, conspiracy, breach of contract and fraud claims, assessing actual damages on each claim, as well as punitive damages on the fraud claims. The jury returned verdicts for Fotomat on appellees' attempted monopolization and lease tying claims.[9]

Pursuant to posttrial motions, the district court reduced the actual damages on appellees' fraud claims as in excess of proof. The district court also determined that appellees' tying, breach of contract, and fraud claims were duplicative and, therefore, entered judgment only on the fraud claims, the largest of the verdicts. The district court also entered treble damage judgments on the jury's conspiracy verdicts.

On appeal, Fotomat contends that (1) the district court erroneously instructed the jury on appellees' fraud claims; (2) the district court should have reduced the punitive damages awarded on the fraud claims; (3) Fotomat and Fotomat Labs were not separate economic entities legally capable of conspiracy; (4) the district court erroneously computed the attorneys' fees it awarded to appellees' attorneys.

II. *Analysis.*

A. *The Fraud Instruction.*

At trial, appellees contended that Fotomat never intended to honor its contractual

---

ment was 10 years with renewal options for three additional five-year periods at $7,000 per renewal. The agreements also provided for a 12 percent royalty or continuing franchisee fee on monthly gross sales exceeding $2,500 and an additional three percent on monthly gross sales for "advertising, public relations and the promotion of the total franchise operation."

6. Three of Ogilvie's franchise agreements provide that such items might also be purchased from other sources if approved by Fotomat.

7. Market surveys conducted by Fotomat in the late 1960's revealed that at least 50 percent of any Fotomat store's customers lived within a one-mile radius of that store and that 80 to 85 percent lived within a two-mile radius. We refer to the placement of company-owned stores within a one-mile radius of franchise stores as "overlapping."

8. In some instances appellees purchased the overlapping stores under Fotomat's agreement to offer such kiosks to its franchisee. If the franchisee did not purchase the overlapping unit, Fotomat would operate it as a company-owned store.

By the time of trial, the Griesedieck corporations closed three of their stores and Ogilvie failed to extend the initial 10-year franchise term on one of his stores.

9. The jury initially returned verdicts in favor of appellees on their lease tying claims but assessed no damages. Because monetary injury was an essential element of these claims, however, the district court then directed the jury to return verdicts in favor of Fotomat on them. *See* 15 U.S.C. § 15 (1976).

commitment to sell merchandise and services at "Fotomat's cost without any markup whatsoever." The evidence disclosed that Fotomat did not pass on to appellees certain discounts and allowances from outside photofinishers. In addition, Fotomat failed to pass on discounts from outside vendors of merchandise resold to appellees. Fotomat concedes on appeal that its withholding of the discounts may have been wrongful as a matter of contract law.[10] Fotomat argues, however, that the jury improperly found fraud without the necessary finding that Fotomat had no intent to honor its contractual commitment at the time it executed the franchise agreements.[11]

Under Missouri law, a case of fraudulent misrepresentation of existing intent must be premised on a misrepresentation that was false when made. *See Slater v. KFC Corp.*, 621 F.2d 932, 936 (8th Cir. 1980). As the Missouri Court of Appeals has stated, "[v]ital to recovery on the theory of an actionable misrepresentation of an existing purpose of state of mind is a *current* intention by the promisor at the time the agreement is made not to perform." *Klecker v. Sutton*, 523 S.W.2d 558, 562 (Mo.App.1975) (emphasis in original).

After examining the verdict-directing instruction, we conclude that the district court properly placed before the jury the issue of Fotomat's intent at the time of contract execution. The district court instructed the jury that its verdict must be for Ogilvie and the Griesedieck corporations if it found:

(1) that [Fotomat] made certain representations to [appellees,] namely: that [Fotomat] would sell merchandise, film and film processing services to [appellees] at [Fotomat's] cost without any markup whatsoever, and

(2) that [Fotomat] intended that [appellees] rely upon such representations in purchasing the respective franchise agreements from [Fotomat] and in continuing to make payments to [Fotomat] thereunder and in continuing to purchase merchandise, film and film processing services from [Fotomat], and

(3) that the representations, if any, were false, and

(4) that [Fotomat] knew the representations were false, and

(5) that the representations were material to the purchase by [appellees] of the Fotomat franchises and the payments made to [Fotomat] thereunder, and

(6) that [appellees] relied on and had the right to rely on the representations in making the purchases, and

(7) that as a direct result of such representations [appellees were] injured and damaged.

If you find and believe that [appellees] have failed to establish any one of the above elements then you must find in favor of Fotomat on the claim stated in this instruction.

Fotomat contends that under this instruction the jury may have predicated fraud liability on a finding that the "no markup" representations became false after the contract period began. We do not agree. This instruction requires the jury, before imposing liability, to find that Fotomat knew its representations were false. The knowledge element of the instruction necessarily implies knowledge that the representations were false at the time they were made. Having submitted this issue to the jury with ample evidence to support the verdicts, the district court properly declined to set aside the jury's findings of fraud liability.[12]

10. Fotomat's unsuccessful defense to appellees' contract claims was that it charged appellees only what it in good faith believed to be its "basic" cost for the goods and services. Fotomat received two tiers of discounts from its suppliers. The first tier of discounts it passed on to its franchisees; the second it concealed and retained. Fotomat characterized the retained discounts as "cash" or "special discounts" or as advertising allowances, while appellees characterized them as "volume discounts."

11. In light of our examination of the record, we reject appellees' contention that Fotomat has not preserved the jury instruction issue for appeal.

12. Fotomat contends that *Klecker v. Sutton, supra*, 523 S.W.2d at 562, mandates reversal of the fraud judgments. In dictum, the intermediate appellate court disapproved the form of the jury instruction used in a misrepresentation of existing intent fraud case. The jury instruction disapproved in *Klecker* mirrors that used by the district court here following Missouri Approved Instruction 23.05. Such an instruction does pose potential problems that a more explicit instruction on the knowledge element would prevent. For the reasons stated in text, however, we do not find the giving of this instruction reversible error.

## B. *Punitive Damages.*

■ The jury assessed actual damages on appellees' fraud claims in amounts exceeding proof. The district court, therefore, remitted the actual damage awards to the maximum amounts that would be sustained by appellees' proof.[13]

■ The jury also assessed exemplary damages on each of the eleven actual damage judgments,[14] awarding punitive damages in amounts exactly four times those given for actual damages.[15] Fotomat contends that the district court erred in not reducing the punitive damages to reflect its reduction of actual damages and that, in any event, this court must reduce the awards as excessive. We agree.

In *Senn v. Manchester Bank of St. Louis,* 583 S.W.2d 119, 138 (Mo.1979), the Missouri Supreme Court, after reducing actual damages, ordered a proportionate reduction of punitive damages to reflect the ratio of punitive to actual damages assessed originally by the trial court. A similar abatement is proper in this case.

■ As they now stand, the punitive damages awards are irrational and excessive, and, therefore, must be reduced. The amount of punitive damages "must have some reasonable relationship to the injury inflicted." *Wisner v. S.S. Kresge Co.,* 465 S.W.2d 666, 669 (Mo.App.1971); *Northern v. McGraw-Edison Co.,* 542 F.2d 1336, 1349–50 (8th Cir. 1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977). The current assessments of punitive damages bear no relationship, reasonable or otherwise, to plaintiffs' injury.[16] Small actual damage awards, which should reflect the least injury, are coupled with the largest punitive assessments, while similar awards for actual harm are coupled with widely disparate exemplary damages. We can find no rational justification for these awards. Moreover, the ratios of punitive to actual damages demonstrate their excessiveness. At the minimum, punitive damages are eight or nine times actual damages; at the

---

**13.** Appellees conceded the propriety of remittitur to these amounts. Fotomat, on the other hand, contends that the district court should have ordered a new trial on the actual damage awards for fraud rather than entering a remittitur. We disagree. The district court correctly followed the standard established for this circuit in *Slatton v. Martin K. Eby Construction Co., Inc.,* 506 F.2d 505, 508–09 (8th Cir. 1974), *cert. denied,* 421 U.S. 931, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975).

**14.** The jury granted damages on behalf of Ogilvie and on behalf of Griesedieck's ten separate corporations.

**15.** The jury's actual and punitive damage awards for fraud were as follows:

| | Actual Damages | Punitive Damages |
|---|---|---|
| Griesedieck Enterprises (GE) | | |
| GE No. 1 | $ 76,500 | $ 306,000 |
| GE No. 2 | 39,500 | 158,000 |
| GE No. 3 | 50,000 | 200,000 |
| GE No. 4 | 62,500 | 250,000 |
| GE No. 5 | 29,500 | 118,000 |
| GE No. 6 | 126,500 | 506,000 |
| GE No. 7 | 48,000 | 192,000 |
| GE No. 8 | 58,000 | 232,000 |

| | Actual Damages | Punitive Damages |
|---|---|---|
| Griesedieck Enterprises | | |
| GE No. 9 | $ 22,500 | $ 90,000 |
| GE No. 10 | 87,000 | 348,000 |
| Total | $600,000 | $2,400,000 |
| | (remitted to $121,456) | |
| Ogilvie | $250,000 | $1,000,000 |
| | (remitted to $106,636) | |

**16.** As modified by the district court, the judgments are as follows:

| | Actual Damages Imposed (Exclusive of Prejudgment Interest) | Punitive Damages Imposed | Ratio |
|---|---|---|---|
| GE No. 1 | $ 15,498 | $ 306,000 | 19.7 |
| GE No. 2 | 17,285 | 158,000 | 9.1 |
| GE No. 3 | 11,805 | 200,000 | 16.9 |
| GE No. 4 | 15,440 | 250,000 | 16.2 |
| GE No. 5 | 14,634 | 118,000 | 8.1 |
| GE No. 6 | 9,662 | 506,000 | 52.4 |
| GE No. 7 | 10,891 | 192,000 | 17.6 |
| GE No. 8 | 10,742 | 232,000 | 21.6 |
| GE No. 9 | 7,981 | 90,000 | 11.3 |
| GE No. 10 | 7,518 | 348,000 | 46.3 |
| Total | $121,456 | $2,400,000 | 19.8 |
| Ogilvie | $106,636 | $1,000,000 | 9.4 |

maximum, forty-six and fifty-two times. These damage judgments must·be overturned as an abuse of discretion. *Beggs v. Universal C.I.T. Credit Corp.*, 409 S.W.2d 719, 724 (Mo.1966); *Young v. Jack Boring's, Inc.*, 540 S.W.2d 887, 898 (Mo.App.1976).

We recognize that appellate courts are reluctant to reduce a punitive damage award because such a decision "rests peculiarly in the discretion of the jury." *Wisner v. S.S. Kresge Co., supra*, 465 S.W.2d at 669. We believe, however, that when the jury clearly assesses punitive damages as a multiple of actual damages, the court, by proportionally reducing punitive damages, will more likely effect the original judgment of the jury, while avoiding excessive damage awards. On the record of this case, we conclude that the jury's assessment of a four to one ratio is a reasonable award of exemplary damages and, accordingly, we order a reduction of the punitive damages to reflect this ratio.

### C. *Antitrust Conspiracy.*

As part of their antitrust case, appellees alleged that Fotomat conspired with its wholly owned subsidiary, Fotomat Labs, to eliminate appellees as competitors in metropolitan Kansas City and St. Louis, in violation of section 1 of the Sherman Act.[17] The jury returned verdicts in favor of Ogilvie and Griesedieck on their conspiracy claims with actual damages of $656,000 awarded. The district court trebled the actual damage assessments and entered judgments on the verdicts against Fotomat totalling $1,968,000.[18]

Fotomat contends that appellees failed to prove the requisite plurality of actors neces-sary to prove a conspiracy claim. In other words, appellant argues that, despite their separate incorporation, Fotomat and Fotomat Labs constituted a single economic entity or business enterprise incapable of conspiracy in violation of section 1.

It has long been accepted, of course, that proof of concerted action by at least two entities is essential to establish a section 1 claim. *See, e. g., Union Pacific Coal Co. v. United States*, 173 F. 737, 745 (8th Cir. 1909). *See also Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 883–84 (8th Cir. 1978). The issue here is whether Fotomat and Fotomat Labs, as separate corporations, are such distinct entities within the purview of section 1 of the Sherman Act.

We must start with the Supreme Court's repeated statements that related corporations, because legally distinct, may be capable of conspiracy. *See Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–1986, 20 L.Ed.2d 982 (1968) (parent and wholly owned subsidiary). *Accord, Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 974–975, 95 L.Ed. 1199 (1951) (parent and partially owned subsidiary); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 261–262, 95 L.Ed. 678 (1951) (wholly owned subsidiaries); *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 116, 68 S.Ct. 947, 951, 92 L.Ed. 1245 (1948) (parent, wholly owned subsidiaries, officers and directors); *United States v. Yellow Cab Co.*, 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947) (parent and partially owned subsidiaries). The circuits, however, do not agree on the limits of this intraenterprise conspiracy doctrine established by these cases.[19]

---

17. Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal[.]"

18. *See* 15 U.S.C. § 15 (1976).

19. Authorities picturesquely refer to such conspiracies between related companies as "bath-tub conspiracies." *See, e. g.*, Kempf, *Bathtub Conspiracies: Has Seagram Distilled a More Potent Brew?*, 24 Bus.Law. 173 (1968). Courts appear unanimous in holding that action taken by an unincorporated division in concert with the management of its corporation does not give rise to a section 1 conspiracy. *See, e. g., H & B Equipment Co., Inc. v. International Harvester*, 577 F.2d 239, 244 (5th Cir. 1978).

The Third and Fifth Circuits have held that, as a matter of law, a parent and its wholly owned subsidiaries, when separately incorporated, together provide the requisite plurality of actors. *See Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 33–34 & n.49 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); *H & B Equipment Co., Inc. v. International Harvester*, 577 F.2d 239, 244–45 (5th Cir. 1978).[20] The Seventh and Ninth Circuits have held that the capacity of related corporations to conspire, in violation of section 1, is a question of fact to be answered under the circumstances of each case. *See Las Vegas Sun, Inc. v. Summa Corp.*, 610 F.2d 614, 617–18 (9th Cir. 1979), *cert. denied*, 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 726–27 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980); *Harvey v. Fearless Farriss Wholesale, Inc.*, 589 F.2d 451, 455–58 (9th Cir. 1979); *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 801–03 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977) (dictum).[21] *See also Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1358–59 n.1 (2d Cir. 1976) (dictum expressing skepticism toward intraenterprise conspiracy doctrine).

 We agree with the Seventh and Ninth Circuits that the Supreme Court has not foreclosed a single enterprise defense to section 1 liability for related, although separately incorporated, companies. We believe a holding that the formality of separate incorporation forecloses such a defense elevates form over substance in a manner inconsistent with the intent of the antitrust laws.[22] *See United States v. Yellow Cab Co., supra*, 332 U.S. at 227, 67 S.Ct. at 1565 (Sherman Act is aimed at substance rather than form). *See also United States v. Citizens & Southern National Bank*, 422 U.S. 86, 113–14, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975). *Cf. Sunkist v. Winckler & Smith Co.*, 370 U.S. 19, 27–29, 82 S.Ct. 1130, 1134–1135, 8 L.Ed.2d 305 (1962) (looking to substance of organizational distinctions for purpose of applying statutory antitrust immunity). Congress has distinguished courses of conduct which are illegal when undertaken by a plurality of actors from those which are illegal when undertaken by

---

**20.** The Third Circuit has suggested an exception to the intraenterprise conspiracy doctrine when the concerted action by legally distinct entities is limited to the internal management of a single firm. *See Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp., supra*, 579 F.2d at 33–34 n.49. This "exception" has long been proposed by commentators to avoid the barriers to operation in multicorporate form that the intraenterprise conspiracy doctrine erects. *See, e. g.*, 1 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 6.01[2] (1979); Sullivan, *Handbook of the Law of Antitrust* 323–29 (1977); *Report of the United States Attorney General's National Committee to Study the Antitrust Laws* 30 36 (1955). For an equally long time, this proposed exception has been rejected as unworkable and unreal. *See, e. g.*, Note, *Intra-Enterprise Conspiracy Under Section 1 of the Sherman Act: A Suggested Standard*, 75 Mich.L.Rev. 717, 731–34 (1977) (discussing exception and citing literature).

**21.** *But see United States v. New York Great A. & P. Tea Co.*, 173 F.2d 79 (7th Cir. 1949); *United States v. General Motors Corp.*, 121 F.2d 376 (7th Cir.), *cert. denied*, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1941).

**22.** Despite appellees' assertions, we have not previously denied the existence of a single enterprise defense for related corporations. Our relevant prior decisions stand for two unarguable propositions. First, a complaint alleging conspiracy between related corporations, in violation of section 1, may not be dismissed for failure to state a claim merely because the companies are commonly owned. *See TV Signal Co. of Aberdeen v. American Tel. & Tel. Co.*, 462 F.2d 1256, 1260 (8th Cir. 1972) (parent and wholly owned subsidiary). Second, if such a complaint is answered with a common ownership defense, a record raising an issue of fact concerning the defense precludes the grant of summary judgment in favor of the defendant. *See Minnesota Bearing Co. v. White Motor Corp.*, 470 F.2d 1323, 1328–29 (8th Cir. 1973) (parent and wholly owned subsidiary). Indeed, our holding in the latter case implicitly suggests the existence of a single enterprise defense to section 1 liability.

a single entity. *Compare* section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), *with* section 2 of the Sherman Act, 15 U.S.C. § 2 (1976).[23] To impose section 1 liability on what in reality constitutes a single economic enterprise would imprudently blur this purposeful distinction.

█ We must, therefore, examine the record to determine whether appellees presented sufficient evidence for the jury to find a plurality of actors.[24] Fotomat created Fotomat Labs as a wholly owned subsidiary in 1971 for the purpose of establishing an internal film processing or photofinishing capacity. Throughout its existence as a subsidiary,[25] Fotomat Labs provided film developing services for the Fotomat-owned or franchised kiosks.

Fotomat referred to itself and its subsidiary collectively as "the Company."[26] Corporate officers of Fotomat always served as the officers of Fotomat Labs. Moreover, bonuses and other executive remuneration over fixed salaries were based on calculations of Fotomat's profit alone. In addition, Fotomat Labs had no corporate headquarters separate from those of Fotomat. Fotomat Labs never filed separate financial statements to the Securities and Exchange Commission or the Internal Revenue Service. On the contrary, Fotomat filed consolidated statements reflecting the financial condition of its entire organization including both unincorporated divisions and its subsidiary. Finally, the uncontroverted evidence establishes that Fotomat incorporated Fotomat Labs for the purposes of according disparate labor benefits to the two companies' employees and availing itself of certain tax benefits.

Appellees cite certain statements of Fotomat's vice president and its in-house counsel, as well as Fotomat's internal accounting practices, in arguing that Fotomat and Fotomat Labs constituted distinct entities capable of conspiracy.[27] Compared to the evi-

---

**23.** One commentator has characterized the distinction as one "between loose-knit organizations and close-knit organizations." McQuade, *Conspiracy, Multicorporate Enterprises, and Section 1 of the Sherman Act*, 41 Va.L.Rev. 183, 214 (1955). As Mr. McQuade wrote:

An organization of independent competitors united by agreement to divide a market or fix prices contravenes Section 1, irrespective of any circumstantial justifications. Unless it contravenes the monopoly provisions, an organization composed of a single enterprise is entitled to freedom from Sherman Act liability.

The reason behind this distinction rests on two basic assumptions: First, that a closely integrated enterprise probably affords technological economies of scale which more than offset the likelihood of greater efficiency should its constituent parts compete with one another; Second, that agreements between combinations of independents serve no function other than that of increasing the market power of the parties to the agreement[.] [*Id.* at 214–15.]

**24.** Appellees contend that Fotomat failed to preserve its claim of error on this issue. We have carefully reviewed the pleadings and the record, and find this contention to be without merit.

Because we determine that appellees did not make out a submissible jury question on this issue we resolve it as one of law on appeal. Our disposition of this issue makes it unnecessary to reach Fotomat's arguments that appellees adduced no proof of agreement or antitrust injury.

**25.** Fotomat dissolved Fotomat Labs in 1977 and thereafter operated it as a division of Fotomat. When Fotomat dissolved Fotomat Labs, the latter became Fotomat's processing services division with a function and mode of operation no different than when it was Fotomat's wholly owned subsidiary.

**26.** Indeed, Alvin Griesedieck testified that he had always thought Fotomat and Fotomat Labs to be one and the same.

**27.** Fotomat's vice president, Ray Ehlers, testified that Fotomat Labs "was a separate business and we elected to treat it as such." Fotomat's general counsel and vice president, Michael H. Dessent, stated in 1973 that Fotomat Labs had "independent personnel, laboratories, machinery, equipment and costs. It bills [Fotomat] just as independent processors bill [Fotomat] and [Fotomat] operate[s] on the same discount rate for print processing." The Seventh Circuit accurately characterized vice pres-

dence adduced by Fotomat, however, this evidence is virtually devoid of antitrust significance.

We therefore conclude that Fotomat Labs constituted the corporate alter ego of Fotomat. Accordingly, we agree with the Seventh Circuit that Fotomat and Fotomat Labs in reality constituted one enterprise incapable of conspiracy under section 1 of the Sherman Act. *See Photovest Corp. v. Fotomat Corp., supra*, 606 F.2d at 727.[28]

### D. Attorneys' Fees.

The district court awarded attorneys' fees to appellees' counsel in the amount of $514,-500 on their successful antitrust claims. In light of our disposition of the conspiracy issue, we remand the case to the district court for entry of an appropriate award of attorneys' fees for appellees' successful tying claims alone, even though the court incorporated these claims into the larger judgment for fraud.

### III. Conclusion.

Accordingly, on Fotomat's appeal (No. 80–1064), we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

■ Appellees cross-appeal (No. 80–1065) from the district court's judgment denying their request for an injunction against those Fotomat practices held to violate the antitrust laws. The district court found that, because of the outstanding judgments against Fotomat, appellees did not face any threat of imminent harm. We cannot say

ident Ehlers' statement as "isolated[.]" *Photovest Corp. v. Fotomat Corp., supra*, 606 F.2d at 727.

**28.** The record before us in this case is substantially the same as that before the Seventh Circuit in *Photovest.* However, because the Seventh Circuit's reversal of the district court followed a bench trial, we have independently considered the record under the standard appropriate for a review of judgments entered on jury verdicts. In other words, we have exam-

that the district court abused its discretion in refusing to issue an injunction against Fotomat. Accordingly, we affirm on the cross-appeal.

No costs are awarded on the appeal and cross-appeal.

### ADDENDUM

The following is a summary of the district court judgments for actual damages on appellees' fraud claims affirmed on appeal and the judgments for punitive damages as modified on appeal.

| | Actual Damages (not including prejudgment interest | Punitive Damages |
|---|---|---|
| Griesedieck Enterprises (GE) | | |
| GE No. 1 | $ 15,498 | $ 61,992 |
| GE No. 2 | 17,285 | 69,140 |
| GE No. 3 | 11,805 | 47,220 |
| GE No. 4 | 15,440 | 61,760 |
| GE No. 5 | 14,634 | 58,536 |
| GE No. 6 | 9,662 | 38,648 |
| GE No. 7 | 10,891 | 43,564 |
| GE No. 8 | 10,742 | 42,968 |
| GE No. 9 | 7,981 | 31,924 |
| GE No. 10 | 7,518 | 30,072 |
| Total | $ 121,456 | $ 485,824 |
| Ogilvie | $ 106,636 | $ 426,544 |

We do not disturb the district court's award of prejudgment interest on the judgments as affirmed and as modified on appeal. In addition, appellees are entitled to postjudgment interest on the judgments for actual damages as affirmed and punitive damages as modified from the date of the initial entry of the judgments in the district court.

ined the record to determine whether there was sufficient evidence to sustain the jury verdict.

Our disposition of this issue does not require us to delineate fully the boundaries of a single enterprise defense to section 1 charges. *Cf.* Note, *supra* note 20, 75 Mich.L.Rev. at 735–44. *See also Harvey v. Fearless Farriss Wholesale, Inc., supra*, 589 F.2d at 455–56 n.8 (collecting cases which have limited intraenterprise conspiracy doctrine).