**BROADWAY DELIVERY CORP., et al.,**
Plaintiffs-Appellants,

v.

**UNITED PARCEL SERVICE OF AMERICA, INC., et al.,**
Defendants-Appellees.

No. 534, Docket 80–7727.

United States Court of Appeals, Second Circuit.

Argued March 16, 1981.

Decided June 3, 1981.

Joseph M. Alioto, San Francisco, Cal. (Lawrence G. Papale, Alioto & Alioto, San Francisco, Cal., and Elliot L. Schaeffer, Schaeffer, Schaeffer & Sands, New York City, on the brief), for appellants.

Irving R. Segal, Philadelphia, Pa. (Dennis R. Suplee, Arlene Fickler, Diana S. Donaldson, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Proskauer, Rose, Goetz & Mendelsohn, New York City, on the brief), for appellees.

Before LUMBARD and NEWMAN, Circuit Judges, and TENNEY,* District Judge.

NEWMAN, Circuit Judge:

This is an appeal from a judgment of the District Court for the Southern District of New York (Kevin T. Duffy, Judge) dismissing, after a jury trial, a complaint for treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15 (1976). The suit was brought by various firms that transport packages in the New York metropolitan area against

* The Honorable Charles H. Tenney of the United States District Court for the Southern District of New York, sitting by designation.

124

United Parcel Service of America, Inc. (UPSA) and its wholly owned operating subsidiary in the Northeast, United Parcel Service, Inc. (New York) (UPSNY). The plaintiffs charged that from 1960 to 1975 the defendants conspired to monopolize, and monopolized or attempted to monopolize the pickup and delivery of small packages sent by wholesalers in the New York garment district, in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976). The § 1 claim was disposed of by summary judgment on the basis of the defendants' unopposed showing that during the relevant period they conducted their affairs and held themselves out as a single firm, incapable of conspiring with itself in violation of § 1. The § 2 claims were tried to a jury, which returned a verdict for the defendants. On appeal, the plaintiffs-appellants challenge primarily the District Court's rejection of their § 1 claim, and the Court's jury instruction that they could not prevail on their § 2 monopolization claim unless they proved that during the relevant period the defendants controlled at least 50% of the relevant market.[1] We conclude that the plaintiffs abandoned their § 1 claim and that the challenged jury instruction was erroneous but harmless error in light of the plaintiffs' failure to present a *prima facie* case of a § 2 monopolization violation. Our disposition of these issues moots the other claims of error, and we therefore affirm.

## FACTUAL BACKGROUND

The plaintiffs transport goods by motor vehicle in and around what is known in the trade as the New York commercial zone, an area encompassing New York City and parts of northern New Jersey, which is exempt from regulation by the Interstate Commerce Commission and the New York State Department of Transportation. Most of the plaintiffs limit their activities to

carrying merchandise from garment manufacturers in the commercial zone to retail stores in the commercial zone or to freight consolidators and post offices for re-delivery to retail stores throughout the United States. The plaintiffs who restrict their activities to the unregulated commercial zone are not required to have ICC operating rights, and many have none. Like anyone with a truck who wishes to engage in the transportation business in this area, these plaintiffs are free to pick up and deliver, as often as they wish, as many packages of any size and weight as they are physically able to carry, at any rate that the market will bear.

The defendant UPSA is a Delaware corporation owning all the stock of defendant UPSNY, a New York corporation, and nondefendant United Parcel Service, Inc. (Ohio), an Ohio corporation (UPSO). The UPS subsidiaries transport packages in interstate commerce. UPSNY operates in thirteen Northeastern states, including the New York commercial zone; UPSO operates throughout the rest of the forty-eight contiguous states. Although separately incorporated, the subsidiaries operate cooperatively under a management agreement with UPSA to provide a unified transportation service for shippers throughout the country. During the relevant period, the management agreement provided that UPSA would supply the subsidiaries with a full range of management services in exchange for 4.5% of their gross receipts plus 50% of their net profits. The agreement further provided that UPSA would indemnify each subsidiary against operating losses it sustained in any year in which it followed UPSA's advice and recommendations.

Unlike the plaintiffs who restrict their activities to the commercial zone, the UPS

1. The plaintiffs also challenge the District Court's refusal to allow them to recount statements made to them by certain garment manufacturers concerning the reasons their customers had given them for preferring to have their orders shipped by the defendants. The plaintiffs offered this hearsay testimony to prove that the manufacturers' customers preferred

the defendants because of their lower rates. Finally, the plaintiffs challenge the Court's admission in connection with the issue of damages of a defense exhibit showing that from 1970 to 1975 the volume of small packages carried by at least one of the plaintiffs actually increased.

subsidiaries operate under the jurisdiction of the ICC. During the relevant period, their ICC operating certificates prohibited them from carrying a package weighing more than 50 pounds or measuring more than 108 inches in length and girth combined. The certificates also prohibited them from transporting from a single shipper to a single consignee in any one day packages having an aggregate weight of more than 100 pounds. The rates charged by the UPS subsidiaries, contained in tariffs filed with the ICC, are modeled after and closely parallel the rates charged by the United States Postal Service, the UPS organization's principal competitor. The UPS rates depend on the weight of the package and the distance to be traveled and are uniform for shippers throughout the country.

The record on appeal sheds little additional light on the nature of the market in which the parties conduct their operations. The plaintiffs contend that they established a relevant service market consisting of the pickup and delivery of wholesale packages weighing less than 50 pounds, and a relevant geographic market consisting of one of the basic administrative and operating units of the UPS organization, namely, the "Metro New York District," an area consisting in large part of the New York commercial zone. The defendants contend that the plaintiffs' definition of the relevant service market is too narrow in that it excludes some of the plaintiffs themselves, for example, a freight consolidator, who neither picks up nor delivers any packages. The defendants also challenge the plaintiffs' definition of the relevant geographic market, noting that the UPS companies operated during the period in question on a nationwide basis, that the Postal Service also operated nationwide, that much of the merchandise carried locally by the plaintiffs was eventually delivered to points throughout the United States, and that some of the plaintiffs carried merchandise to and from points outside the Metro New York District. On our view of the case, it is unnecessary to resolve the question whether the evidence was sufficient to establish the service and geographic markets urged by the plaintiffs. For purposes of this appeal, we will assume that the relevant service and geographic markets are the ones claimed by the plaintiffs.

How the parties fared in the relevant market is an issue of some uncertainty. The plaintiffs alleged in their complaint that UPSNY's share of the relevant market steadily increased throughout the relevant period due to, among other exclusionary practices, below-cost pricing subsidized by UPSA, and that UPSNY eventually acquired more than a 50% share of the relevant market. The plaintiffs' evidence established that UPSNY's traffic tripled during the relevant period and that its revenues increased sevenfold. But the plaintiffs presented no evidence of UPSNY's market share at any time during the period in question. To support their claim that the defendants had engaged in predatory pricing, the plaintiffs relied on summaries of UPSNY's operations prepared by the defendants for internal purposes, and on the record of the payments the defendants made to each other under their management agreement. The plaintiffs interpreted the operating summaries as proof that UPSNY had consistently operated at a loss. However, the defendants' expert in cost accounting testified without rebuttal that the summaries were not only ill-suited for the purpose of showing the profitability of UPSNY's operations, but that, when the figures were properly adjusted, they showed that UPSNY made substantial profits in most years. Losses occurred only in 1963, soon after UPSNY began operating in the relevant market, and in those years in which UPSNY was beset by major strikes. The record of the defendants' payments to each other showed that during the relevant period UPSA collected from UPSNY a total of over $178 million and indemnified it against losses totaling $37.6 million.

## DISCUSSION

### A. The § 1 Claim

· The plaintiffs' § 1 claim was directed primarily at the indemnification provision

of the defendants' management agreement. The plaintiffs contended that this provision had the purpose and effect of unreasonably restraining competition in the relevant market by enabling UPSA to use the profits earned by UPSO to subsidize predatory pricing by UPSNY. Following three years of pretrial proceedings, the defendants moved for partial summary judgment on the § 1 claim, contending on the basis of affidavits and deposition testimony that the agreement among the UPS entities was outside the purview of § 1 because they had operated at all relevant times as a single enterprise. The plaintiffs opposed the motion on the ground that the defendants had operated independently and requested an opportunity to engage in further discovery to elicit proof to support their claim. The District Court ruled that the defendants' capacity to conspire with each other in violation of § 1 was an issue of fact. Though the defendants' factual showing was unrebutted, the Court continued the motion for sixty days to allow the plaintiffs further opportunity to oppose the motion. The Court warned the plaintiffs that unless they submitted appropriate proof within the sixty-day period, their § 1 claim would be dismissed. The plaintiffs never submitted the required proof, despite several additional extensions of time totaling more than six months, and the defendants' motion was eventually granted.

At a pretrial conference one year later, the plaintiffs' new counsel inquired whether the Court would be willing to submit the § 1 claim to the jury in the event the plaintiffs presented evidence demonstrating that the defendants had entered into an agreement prohibited by § 1. Judge Duffy replied that, despite the order dismissing the § 1 claim (which remained subject to revision, Fed.R.Civ.P. 54(b)), he had an open mind on the matter and was willing to permit the plaintiffs to attempt to prove the elements of their § 1 claim. Nevertheless, the plaintiffs failed to press the § 1 claim before the jury, requested no jury instruction on the claim, and voiced no objection when no § 1 instruction was given.

■ Whether the applicability of the intracorporate conspiracy doctrine is an issue of law or fact, a question that continues to divide the other circuits,[2] we agree with the defendants that the plaintiffs abandoned their § 1 claim when they failed to pursue it at trial. The District Court's grant of the plaintiffs' request to litigate the claim before the jury afforded them a full opportunity to secure revision of the order granting the partial summary judgment prior to the entry of any final judgment. The plaintiffs had more than the procedural possibility of revision contemplated by Rule 54(b); they had the District Court's explicit invitation to proceed. Their appeal from the dismissal of their claim is therefore no different from prior appeals challenging the rejection of claims and defenses that were pleaded but not properly pursued in the trial court; in such cases an appellate court will not relieve a party of the effect of its procedural default, except in the most extraordinary circumstances to prevent a miscarriage of justice. *See Stanspec Corp. v. Jelco Inc.*, 464 F.2d 1184, 1187 (10th Cir. 1972); *King v. Stevenson*, 445 F.2d 565, 571 (7th Cir. 1971); *Evans v. S.J. Groves & Sons Co.*, 315 F.2d 335, 341 (2d Cir. 1963). No such circumstances exist here.

### B. *The § 2 Monopolization Claim*

In instructing the jury on the plaintiffs' § 2 monopolization claim, the District Court explained, in traditional language, that the defendants must be shown to have willfully acquired or maintained monopoly power—the power to control prices or exclude com-

---

**2.** *Compare Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 33–34 & n.49 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978) (issue of law), *and H & B Equipment Co., Inc. v. International Harvester Co.*, 577 F.2d 239, 244–45 (5th Cir. 1978) (same), *with Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 726–27 (7th Cir. 1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980) (issue of fact), *Ogilvie v. Fotomat Corp.*, 641 F.2d 581, 1980–81 Trade Cases (CCH) ¶ 63,817 (8th Cir. 1981) (same), *and Las Vegas Sun, Inc. v. Summa Corp.*, 610 F.2d 614, 617–18 (9th Cir. 1979), *cert. denied*, 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 854 (1980) (same).

petition—in the relevant market. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). The jury was then told to determine the defendants' share of the relevant market in deciding whether the defendants possessed monopoly power. If the jury agreed with the plaintiffs' market definition, the defendants' market share was to be determined by calculating the percentage of all the small wholesale packages transported in the Metro New York District that were transported by the defendants. The plaintiffs do not challenge the instruction defining market share in terms of the percentage of packages carried, instead of the more traditional measure of the percentage of revenues received. Instead, their attack focuses on the following instruction concerning the significance of a market share below 50%: "If you find that the defendants possessed less than 50% of the relevant market, you don't have to go any further on a monopolization claim. Possession of less than 50% of the market fails to establish monopoly power." It is not entirely clear from the instructions how the jury was to use market share if it found that the share exceeded 50%. But there is no doubt that the jury was unequivocally told to reject the monopolization claim if the defendants' share was found to be less than 50%.

The significance of particular market shares has evoked varied comment in antitrust law. The cases have considered many different percentages, and the Courts' observations cannot readily be compared because they were made in contexts that ranged from a fact-finder's assessment of the evidence, *e. g., United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (D.Mass.1953), *aff'd,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), to a legal determination of the sufficiency of a claim, *e. g., Brager & Co., Inc. v. Leumi Securities Corp.*, 429 F.Supp. 1341 (S.D.N.Y.1977). Several decisions cast doubt on whether monopoly power can be possessed by a company enjoying less than a 50% market share.

In the early case of *United States v. United States Steel Corp.*, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920), the Supreme Court stated that it was "certain" that the defendant had not achieved a monopoly, reasoning that although "the power [it] attained was much greater than that possessed by any one competitor—it was not greater than that possessed by all of them." *Id.* at 444, 40 S.Ct. at 297. It has frequently been observed, moreover, that the leading cases upholding monopolization claims involved defendants who controlled well over half the relevant market, with market shares ranging from 70% to 100%. *See, e. g., Hiland Dairy Inc. v. Kroger Co.*, 402 F.2d 968, 974 n.6 (8th Cir. 1968) (collecting cases). And an occasional statement can be found labeling a 50% market share a "prerequisite for a finding of monopoly." *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969). In most instances, however, the courts seem to be assessing only the significance of the share possessed by a particular defendant in a particular market, rather than endeavoring to extrapolate a general rule. In *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), for example, Judge Learned Hand considered Alcoa's share under three possible market definitions and thought it "doubtful" whether a share of 60–64%, yielded by one of the definitions, would constitute a monopoly. *Id.* at 424. It seems unlikely that Judge Hand was doubting that any defendant with a 60–64% share of any market, regardless of its structure, could ever be found to possess monopoly power. Even if his doubts ranged beyond the case he was considering, it is significant that he expressed a doubt, not a rule of preclusion.

In *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir. 1980), the case relied on by the District Court as authority for the challenged instruction, we held that a monopolization claim was properly dismissed on a motion for summary judgment despite evidence that at the beginning of the relevant period the defendant had a market share of 48.3%.

But we did not affirm the defendant's judgment simply because 48.3% was less than 50%. Instead we assessed the significance of the defendant's share, specifically noting that the share had steadily declined to 33%. See *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 273 n.11 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (noting evidential significance of decline in market share). In *United States v. United Shoe Machinery Co., supra*, Judge Wyzanski, as the finder of fact, found, on the basis of all the evidence, that the defendant controlled markets in which its share exceeded 50%, but did not control other markets in which its share was less than 50%. *Id.* at 346. Similarly, in *Holleb & Co. v. Produce Terminal Cold Storage Co.*, 532 F.2d 29, 33 (7th Cir. 1976), the Court, in rejecting the sufficiency of a § 2 claim, noted that the defendant's market share did not exceed 60%, but also observed that there was no evidence of the shares of other principal competitors and, in general, insufficient evidence to support a conclusion that the defendant had monopoly power.

The trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence. In *United States v. Columbia Steel Co.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), the Supreme Court recognized that exclusive focus on market share percentages can produce a distorted picture of market power because "the relative effect of percentage command of a market varies with the setting in which that factor is placed." *Id.* at 528, 68 S.Ct. at 1124. The Court said that a true picture emerges only from consideration of additional market characteristics, among them, the strength of the competition, the probable development of the industry, and consumer demand. *Id.* at 527, 68 S.Ct. at 1124. In more recent decisions in the merger context, the Court has reaffirmed its unwillingness to base market power determinations simply on market share data, preferring to treat market share as strong, perhaps presumptive, evidence of the presence

or absence of market power, subject to bolstering or rebuttal by other evidence. *See, e. g., United States v. Citizens & Southern National Bank*, 422 U.S. 86, 120, 95 S.Ct. 2099, 2118, 45 L.Ed.2d 41 (1975); *United States v. Marine Bancorporation*, 418 U.S. 602, 631, 94 S.Ct. 2856, 2874, 41 L.Ed.2d 978 (1974); *United States v. General Dynamics Corp.*, 415 U.S. 486, 497–98, 94 S.Ct. 1186, 1193–94, 39 L.Ed.2d 530 (1974). This approach was followed recently by the Ninth Circuit when it reversed a ruling that an allegation of a market share of 65% was an insufficient pleading of monopoly power, *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924–25 (9th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981), and by several trial courts which recognized, in denying motions to dismiss claims or grant summary judgment, that a particular market share is not inevitably necessary for a firm to be able to control prices or exclude competition. *See Brager & Co., Inc. v. Leumi Securities Corp., supra*, 429 F.Supp. at 1347 (claim alleging 60% share); *American Standard, Inc. v. Bendix Corp.*, 487 F.Supp. 265, 269 (W.D.Mo.1980) (no percentage allegation); *Fox Chemical Co. v. Amsoil, Inc.*, 445 F.Supp. 1355, 1360 (D.Minn.1978) (same). *See generally*, 4 P. Areeda & D. Turner, *Antitrust Law* ¶¶ 908–15 (1978); Landes & Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937 (1981).

We do not doubt the significance of market share evidence as an indicator of either the presence or absence of monopoly power. As the cases and commentators have cautioned, however, the true significance of market share data can be determined only after careful analysis of the particular market. Unfortunately, that type of analysis is more congenial to the economist's blackboard than to the courtroom, especially when an antitrust case is tried to a jury. Formulas can express the pertinent relationships between market power, market share, and demand and supply elasticities, *e. g.*, Landes & Posner, *supra*, at 945 (equation 3), but the data required for sophisticated analysis of a particular market

are not always available, and their comprehension by jurors is uncertain at best. Endeavoring to apply the legal standards of the antitrust laws in the light of modern economics requires trial judges to assess carefully whether the market power evidence creates a fair jury issue of monopoly power and, if so, to afford the jury helpful guidance in resolving the issue.

■ In ruling on a motion for summary judgment or directed verdict, a trial judge should recognize that determining the existence of monopoly power often does not require resolution of the sharp factual disputes associated with such issues as agreement, intent, preparedness, or damages, issues frequently involving credibility disputes that ordinarily require jury resolution. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Undisputed facts may enable the trial judge to rule on a claim of monopoly power as a matter of law, employing economic analysis to the extent the data permit. In making such rulings, the trial judge may properly attach significance to market share evidence. Depending on what the undisputed evidence shows concerning a defendant's market share, the structure of a market, and the activities of the defendant and others within the market, a particular record may permit no reasonable inference other than that the defendant lacks monopoly power. Such a conclusion may be reached if the defendant's share is less than 50%, or even somewhat above that figure, *and* the record contains no significant evidence concerning the market structure to show that the defendant's share of that market gives it monopoly power. In the absence of such evidence and any other evidence from which the power to control prices or exclude competition can reasonably be inferred, a monopolization claim may be withdrawn from a jury.

■ If, however, the record contains evidence framing a fair jury question as to whether a defendant has monopoly power,

the court should assist the jurors in assessing the significance of market share and of other factors bearing on monopoly power. It usually will be helpful to advise a jury that the higher a market share, the stronger is the inference of monopoly power.. And a jury can usefully be given some explanation concerning the relationship between market share and market structure to make it clear that, although a particular share might enable a company to have monopoly power in one market, the same share might not enable another company to have monopoly power in a different market with different market characteristics.

■ The extent to which market characteristics should be explained to the jury in a particular case will vary with the nature of the underlying facts and the expert testimony. Sometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power. But when the evidence presents a fair jury issue of monopoly power, the jury should not be told that it must find monopoly power lacking below a specified share or existing above a specified share. Of course, cases may arise where the parties' dispute concerning market definition creates a jury issue on monopoly power only if one side's market definition, usually the plaintiff's, is established. In such circumstances a jury can be instructed to find for the defendant if the plaintiff fails to prove its definition of the relevant market. Alternatively, a jury could be instructed to answer a special interrogatory concerning market definition, which would permit the trial judge to direct a verdict for the defendant if the plaintiff failed to prevail on its market definition.[3] On the other hand, in some cases, there may be a genuine issue as to monopoly power in the market as defined by either party, in which event the market share under either

---

3. In this case, though there was some dispute as to market definition, the jury was given nc choice between conflicting claims of market

share because there were no data from either side concerning the defendants' market share under either side's view of the relevant market.

definition would not be conclusive. However the instruction is phrased, it should not deflect the jury's attention from indicia of monopoly power other than market share. *See United States v. E.I. du Pont de Nemours & Co., supra; Juneau Square Corp. v. First National Bank of Wisconsin,* 624 F.2d 798, 813 (7th Cir.), *cert. denied,* 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980); *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1219 (9th Cir. 1977); *Jack Winter, Inc. v. Koratron Corp., Inc.,* 375 F.Supp. 1, 68–69 (N.D.Cal.1974). *See generally* 2 P. Areeda & D. Turner, *supra,* ¶¶ 507–16.

■ In light of these considerations, the District Court's instruction, precluding a finding of monopoly power if the defendants' market share was less than 50%, was erroneous for two reasons. First, with the record devoid of any evidence of UPSNY's percentage of the relevant market, whether as defined by the plaintiffs or the defendants, the jury could not possibly apply an instruction to attach conclusive significance to a share below a specified percentage. More fundamentally, even if from all the evidence the jury might somehow have inferred that UPSNY carried less than half the packages in the New York commercial zone, that fact would not automatically preclude a finding of monopoly power by a jury entitled to assess monopoly power on the record as a whole. In this case, however, the challenged instruction does not require reversal because the plaintiffs' evidence was insufficient to permit a reasonable jury to find that UPSNY possessed monopoly power.

■ When the existence of significant market power is an essential element of a claim for treble damages, the plaintiff's market power evidence, whether consisting of the defendant's market share or of specific conduct indicating the defendant's power to control prices or exclude competition, must be substantial. *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696–97 & n.6, 82 S.Ct. 1404, 1409 & n.6, 8 L.Ed.2d 777 (1962); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 430 (7th Cir. 1980);

*California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 733 (9th Cir. 1979). In *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019 (2d Cir. 1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), we noted that to prove a defendant's possession of monopoly power ordinarily requires proof of the "approximate share" of the market controlled by the defendant. *Id.* at 1030. Yet, in this case, the plaintiffs presented no market share data, conceding to the jury that they did not have "any percentages." We do not suggest that evidence of market share is invariably a requirement of a monopolization claim, but when such a traditional form of proof is lacking, the plaintiff must produce unambiguous evidence that the defendant has the power to control prices or exclude competition. Isolated instances of anti-competitive conduct will rarely suffice to show that a defendant's market power is substantial enough to be monopoly power. Such acts may show what power a defendant is seeking, but not necessarily what power it has. *See* P. Areeda & D. Turner, *supra,* ¶ 513.

Lacking market share data, the plaintiffs relied primarily on evidence purporting to show that UPSNY had consistently operated below cost while also realizing steady gains in its volume of traffic. No case supports the view that proof of below-cost pricing, without proof of market structure, is sufficient to establish the market power component of a monopolization claim. It is conceivable that predatory pricing persisting over an extended period could support an inference of monopoly power on the theory that sustaining substantial losses will at some point destroy either the defendant or its competition. But because the social costs of failing to distinguish between predatory pricing and competitive pricing are frequently high, *see* Joskow & Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213, 223–25 (1979), sounder analysis permits examination of a defendant's pricing behavior only after a plaintiff has produced some evidence of a defendant's monopoly power in the relevant market, *id.* at 242–62.

In this case, whatever inference might theoretically be drawn from persistent below-cost pricing, the evidence, considered as a whole, was clearly insufficient to establish a jury issue as to whether the defendants possessed monopoly power. Undisputed evidence showed that the defendants did not have the power to control prices. The defendants' rates were subject to ICC approval and could not realistically be raised substantially without the defendants losing business to their principal competitor, the Postal Service. Undisputed evidence further showed that the defendants lacked the power to exclude competition. The Postal Service could not be excluded by the defendants, and entry into the market was open to anyone willing to make the modest investment required to engage in a local delivery service.

Moreover, the plaintiffs' evidence of predatory pricing was in itself seriously deficient. Whether or not one agrees that proof of pricing below marginal or average variable cost is essential to a predatory pricing claim,[4] the plaintiffs could not demonstrate price predation by the defendants without proof permitting a careful assessment of the relationship between the defendants' prices and costs. *See generally* 3 P. Areeda & D. Turner, *supra,* ¶¶ 710–11. The plaintiffs' proof did not permit a reasonable fact-finder to make this assessment. The summaries of UPSNY's operations lump all its traffic figures in one category, all its revenues in another, and all its profits in a third. It may be that an expert in cost accounting could have discerned in these gross figures a basis for the required analysis, but the plaintiffs presented no such testimony. Indeed, the plaintiffs did not even attempt to counter the testimony of the defendants' expert that the summaries, properly adjusted, show that UPSNY earned substantial profits in all non-strike years. The record of the defendants' payments to each other under the management agreement undercut the plaintiffs' predatory pricing claim, showing that UPSNY earned millions of dollars of gross revenues and net profits during the relevant period.

At most, the plaintiffs' evidence established that UPSNY's prices were lower than the prices charged by some of the plaintiffs. It is questionable whether uniform nationwide rates that are subject to approval by one government agency and to competitive pressure by another can ever be considered predatory merely because the rate schedule yields prices in one area that are lower than the prices charged by local competitors. But the plaintiffs could not prevail on their claim in any event unless they showed that the defendants' prices were unrelated to competition on the merits. Even if, as the plaintiffs contend, the defendants' uniform rates were made possible by using UPSO's profits to subsidize UPSNY's operations, the plaintiffs did not contest the defendants' showing that their nationwide rate structure was calculated to be competitive with the rate structure of the Postal Service, and that the uniformity of their rates throughout the forty-eight states made their service more attractive to shippers.[5]

---

4. *Compare Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977) (failure to show that defendant's prices were below marginal or average variable cost constituted failure as a matter of law to present a *prima facie* case of predatory pricing), *and International Air Industries, Inc. v. American Excelsior Co.,* 517 F.2d 714, 724 (5th Cir. 1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976) (same), *with Chillicothe Sand & Gravel Co. v. Martin Marietta Corp., supra,* 615 F.2d at 432–33 (pricing below marginal or average variable cost relevant but not essential), *and Pacific Engineering & Production Co. v. Kerr-McGee Corp.,* 551 F.2d 790, 797 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977) (same).

5. The plaintiffs urge that the use of UPSO's profits to subsidize UPSNY's operations violated § 2 because UPSO had a monopoly in its geographic market. We have ruled that the use of monopoly power in one market to gain a competitive advantage in another violates § 2, even in the absence of an attempt to monopolize the second market. *Berkey Photo, Inc. v. Eastman Kodak Co., supra,* 603 F.2d at 275–76. But the plaintiffs failed to present substantial evidence that UPSO had monopoly power in its geographic market, or that any of the UPS companies had a monopoly in any market.

Considering all these factors in light of prior cases upholding the dismissal of predatory pricing claims, we have no difficulty concluding that the plaintiffs' evidence of a monopolization violation was insufficient. *See, e. g., Chillicothe Sand & Gravel Co. v. Martin Marietta Corp., supra,* 615 F.2d at 430–34; *California Computer Products, Inc. v. International Business Machines Corp., supra,* 613 F.2d at 739–43; *Janich Brothers, Inc. v. American Distilling Co.,* 570 F.2d 848, 855–59 (9th Cir. 1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1357–59 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). The plaintiffs do not challenge the dismissal of their attempted monopolization claim, to which the erroneous 50% market share instruction did not apply. That claim was properly rejected by the jury, and we therefore need not consider whether it was appropriate for submission to the jury.[6]

Judgment affirmed.

---

**6.** Even though we conclude that the trial evidence was insufficient to frame a jury issue on the monopolization claim, it still would have been prudent for the District Judge, having completed the trial, to submit that claim to the jury so that a verdict could be obtained, a practice that will frequently avoid the need for a retrial.