FRITO–LAY, INC., Plaintiff,

v.

The BACHMAN COMPANY, Defendant.

The BACHMAN COMPANY, Counterclaimant,

v.

FRITO–LAY, INC., Counterdefendant.

No. 83 Civ. 4484 (MGC).

United States District Court, S.D. New York.

Dec. 23, 1986.

Cahill, Gordon & Reindel, New York City by Thomas Curnin, Thorn Rosenthal, David S. Smith, for plaintiff.

Peter G. Eikenberry, New York City by Peter G. Eikenberry, Paul R. Levenson, for defendant-counterclaimant.

CEDARBAUM, District Judge.

Plaintiff Frito-Lay, Inc. ("Frito-Lay") is the manufacturer of "Ruffles" potato chips. "Ruffles" is a registered trademark. In 1983, Frito-Lay commenced this action against defendant Bachman Company ("Bachman") alleging that Bachman's use of the word "ruffled" in connection with sales of its potato chips violates Frito-Lay's trademark. In its answer, Bachman asserted a number of counterclaims alleging antitrust violations by Frito-Lay in the marketing and distributing of its entire line of snack foods. Bachman's third amended answer[1] contains six such counterclaims, each of which charges Frito-Lay with violation of a different statute. The target of defendant's counterclaims Third through Eighth is a marketing program instituted by plaintiff in 1983, called the "To Optimize Profits" plan ("TOP program").

Plaintiff has moved, pursuant to Rule 12(b)(6), to dismiss counterclaims Third through Eighth for failure to state a claim on which relief can be granted. For purposes of this motion to dismiss, the allegations of the counterclaims are presumed to be true. The counterclaims may not be dismissed unless "it appears beyond doubt that the [defendant] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Plaintiff's motion is granted in part and denied in part for the reasons discussed below.

1. Frito-Lay commenced its trademark action on June 14, 1983. Bachman filed its answer and counterclaims on July 5, 1983, prior to the commencement of the TOP program. In response to Frito-Lay's motion to dismiss defendant's counterclaims, Bachman sought leave to amend and Frito-Lay withdrew its motion. Bachman's amended answer, filed on September 20, 1983 (one week after the TOP program began), did not address the TOP program. In October 1983, Frito-Lay moved to dismiss the amended answer. Between September 1983 and June 1986, Bachman filed two other amended answers; the last one because Frito-Lay had amended its complaint. The counterclaims directed at the TOP program were asserted in these two amended answers. On June 28, 1984, Frito-Lay moved to dismiss the antitrust counterclaims. That motion was under consideration by a magistrate until the 1986 amended answer and counterclaims, which are the subject of this motion, were filed. On November 14, 1983, prior to conducting any discovery, Bachman moved to enjoin the TOP program.

All antitrust discovery had been stayed on October 14, 1983. On November 28, 1983, the motion was denied without prejudice to its renewal on an adequate record, and Bachman was granted relief from the stay of discovery for the limited purpose of conducting discovery on the TOP program. After three days of depositions and some document production, Bachman renewed its preliminary injunction motion. On May 21, 1984 the motion was denied for failure to demonstrate a likelihood of irreparable harm.

*The TOP Program*

Although certain key details of the TOP program are in dispute, its main features on which the parties agree are as follows. The TOP program was a 17–week long marketing scheme, instituted by Frito-Lay nationwide, with the exception of certain limited areas in the Northeast. It ran from September 4, 1983 to December 17, 1983, and for a second 17–week period in the metropolitan areas of the Northeast beginning in February 1984. The TOP Program consisted of two separate incentive plans. The first granted a 10 percent increase in Frito-Lay's standard trade allowance. This plan was available to any retail customer of Frito-Lay who already had a ratio of shelf space allocated to Frito-Lay products equal to their proportional share of that retailer's volume of sales of snack foods. It was also available to any customer who agreed to allocate a certain amount of extra shelf space to Frito-Lay products for a period of up to 17 weeks.

Defendant has made no charge that this first part of the Top program was illegal. In fact, in paragraph 158 of its Answer, defendant alleges:

> The potential and actual benefits payable under the bonus allowance, which was automatically available to retailers who were not "underspaced," were *de minimus* compared to the potential and actual benefits payable under the profit guarantee.

Defendant's counterclaims are directed at the second plan of the TOP program. The second plan of the TOP program was a partial profit guarantee. The profit guarantee was available only to those retailers who were "underspaced" on Frito-Lay products; *i.e.*, the stores in which shelf space allotted to Frito-Lay was less than Frito-Lay's proportional share of the salted snack food market in the region where each such store was located. To be eligible for the guarantee, the retailer was required to make a specified amount of additional shelf space available for Frito-Lay products. Retailers eligible for the program entered into a TOP contract with Frito-Lay. Frito-Lay projected the sales volume on the incremental space at 60% of the sales volume of its existing space. If the incremental shelf space allocated to Frito-Lay under the program failed to produce 60% of a specified amount of gross revenues, then Frito-Lay would pay the retailer 27.5% of the shortfall. According to Frito-Lay, 27.5% is the approximate average for supermarkets of gross margin on sales of products.

The counterclaims contain the following allegations regarding the TOP program, which must be accepted as true for purposes of this motion: (1) All smaller retailers were designated automatically as "space to sales" and, accordingly, were ineligible for the profit guarantee; (2) an eligible customer's volume of sales of Frito-Lay products was determined by reference to Frito-Lay's regional share of sales computed by Nielsen market reports, rather than by individual determinations for each customer; and (3) Frito-Lay recommended that the additional shelf space to be allocated to its products come from space previously allocated to its competitors.

*Section 1 of the Sherman Act—Fourth Counterclaim*

Defendant's fourth counterclaim alleges that the TOP program constituted an unreasonable restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982). Defendant alleges that the profit guarantee of the TOP program was made available only to supermarket chains, Frito-Lay's large volume customers for whose shelf space Frito-Lay faced the greatest competition, and that the sole purpose of the TOP program was to injure competition.

Section 1 of the Sherman Act provides, in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....

15 U.S.C. § 1. To sustain a claim under Section 1, a claimant must allege a contract, combination or conspiracy and a resulting restraint of trade or commerce among the several states. *See Oreck*

*Corp. v. Whirlpool Corp.*, 639 F.2d 75 (2d Cir.1980) *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). Injury to one competitor is not a "restraint of trade." To state a claim under Section 1 of the Sherman Act, a claimant must allege injury to competition in general. *BusTop Shelters, Inc. v. Convenience & Safety Corp.*, 521 F.Supp. 989 (S.D.N.Y.1981). In *Jarmatt Truck Leasing Corp. v. Brooklyn Pie Co., Inc.*, 525 F.Supp. 749 (E.D.N.Y. 1981), the court granted defendant's motion to dismiss plaintiff's antitrust claims:

> No violation of section 1 of the Sherman Act is possible absent proof of anticompetitive effect beyond the injury to plaintiffs, and *facts* must be pleaded from which such effect can be inferred.

*Id.* at 750 (emphasis in original).

Defendant has alleged the following facts in support of its Fourth Counterclaim. Pursuant to the TOP program, plaintiff entered into agreements with a number of its key accounts whereby those accounts became eligible for a profit guarantee of 27.5% provided that they increased the shelf space allotted to Frito-Lay products to an amount proportional to sales of Frito-Lay products. The amount of sales of Frito-Lay products for each retailer was determined by reference to the Nielsen Regional Sales Reports,[2] rather than by an examination of each supermarket's sales records.

There is no question that these facts clearly allege the existence of an express contract between Frito-Lay and each of its customers who chose to participate in the TOP program. The real question, however, is whether the agreements between Frito-Lay and its retailers constitute illegal contracts in restraint of trade, that is, contracts which injure competition. In interpreting Section 1 of the Sherman Act, the Supreme Court has observed that:

> [T]he legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

For the reasons discussed below, I find that defendant has failed to state a claim under Section 1 of the Sherman Act, and plaintiff's motion to dismiss defendant's fourth counterclaim is granted.

As plaintiff has pointed out in both its memorandum in support of its motion to dismiss and at oral argument, a number of essential allegations are missing from de-

---

**2.** The method by which Frito-Lay determined its percentage of the market for individual retailers is in dispute. While Bachman contends it was done by reference to Nielsen regional reports and is, therefore, not an accurate reflection of sales figures [for individual retailers], Frito-Lay contends that it attempted to make separate determinations for each customer, either by reference to already existing sales figures or by computations for that express purpose. In his opinion of November 28, 1983, denying Bachman's motion to enjoin the TOP program, Judge Sofaer noted:

> The record of the argument conducted on November 23, 1983, demonstrates that Bachman's view of the facts about the TOP program is inaccurate in several, highly material respects, and is disputed in others. In particular, Bachman's claim that extra shelf space in this program must come from Frito-Lay's competitors proved to be in error; and Frito-Lay claims that the sales data it uses is as specific as possible, and that sales by individual stores is often used as the data base.
>
> For purposes of this motion, I have assumed that defendant's position is correct.

fendant's counterclaims. Foremost is defendant's failure to allege that plaintiff obtained a greater share of shelf space than that equivalent to its share of the market or, conversely, that defendant's percentage of shelf space fell below its market share as a result of plaintiff's profit guarantee. Nor does defendant allege any coercive or threatening behavior on Frito-Lay's part in convincing customers to enter into a "TOP" contract. In fact, plaintiff stated at oral argument, and defendant did not disagree, that 65% of its eligible customers chose not to participate in the program.

In addition, the customers' agreement does not contradict their own competitive interests. Space-to-sales marketing strategies appear to be a commonplace tool for competitors. In *Matter of Kellogg Co., et al.*, 99 F.T.C. 8 (1982), the Federal Trade Commission charged Kellogg, General Mills and General Foods with engaging in practices in violation of Section 5 of the Federal Trade Commission Act, which had the effect of maintaining a noncompetitive market structure in the production and sale of ready-to-eat cereals. One of the practices challenged by the Commission was Kellogg's shelf space marketing program. The administrative law judge made the following factual findings regarding Kellogg's competition for retail shelf space:

460. The principle of space according to sales ensured that the retailers would avoid out-of-stocks and over-stocks, increase their efficiency and profitability and reduce labor costs. Consequently, the retailer would achieve a better utilization of its capital and a better return on its investment.

461. Kellogg did not invent the principle of allocating shelf space by sales volume. Sales volume is, and has been, the basic method of space allocation throughout grocery stores. A retailer's profitability is directly related to sales turnover. The allocation of shelf space according to sales volume reduces the likelihood that a product will be out of stock, maximizes turnover and return on investment and minimizes lost sales and lost profit both to the retailer and the manufacturer.

*Id.* at 144 (citations to transcript omitted). Although the administrative law judge's initial decision was ultimately overturned on other grounds and the Commission's complaint was dismissed with prejudice, the findings set forth above are relevant here. Defendant has not alleged that Frito-Lay was attempting to do anything more than increase its shelf space in those stores that did not have space-to-sales allocated shelves.

Plaintiff cites *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir.), *cert. denied*, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984), as further support for the legality of space-to-sales competitive activity. In *Bayou Bottling*, the plaintiff challenged defendant's practice of prohibiting all but its own products from being displayed in vending machines and coolers the defendant supplied to retailers. While not directly on point, the court's comments in refusing to find that defendant's activities violated the Sherman Act evidence the ordinariness of this type of activity:

The shelf space argument also lacks merit. Stores allot shelf space to the bottlers in proportion to market activity. A bottler with a popular product is given a greater portion of available shelf space than a bottler with a product which has less sales appeal ... But Bayou implies an antitrust injury and suggests an entitlement to more shelf space than its market share would justify. The district court correctly rejected this asserted antitrust injury.

*Id.* at 304.

In denying Bachman's request for a preliminary injunction to enjoin the TOP Program, Judge Sofaer observed:

Bachman ignores the potential utility in the Frito-Lay program. The program is claimed to provide no more than an economic cushion (of about 60% of any loss) for retailers who agree to adjust their shelf space for salty snack foods to reflect the proportion of such sales by manufacturers. Frito-Lay claims without significant contradiction that a more accurate allocation of shelf space results in greater efficiency and profits for the re-

tailer. The retailers are also apparently free to switch out of this program at any time, and Bachman is free to encourage such switch through competitive programs of its own. Bachman must deal with these factual contentions to establish a credible case of antitrust violations.

Bachman has yet to deal with these factual contentions. While Bachman alleges that it lost business as a result of the TOP Program,[3] it does not allege that any competitor's shelf space was reduced below its sales-to-space ratio or that any competitor was excluded from any particular retail outlet. Moreover, while defendant alleges that it suffered a loss of profits during the time the TOP program was in effect, it has not alleged any injury to competition, in general, or to its own business, in particular, lasting beyond the time of the TOP program. And even though defendant has made specific allegations regarding its own market losses, it has asserted no facts to show that its losses were a result of defendant's allegedly anticompetitive activity, rather than a result of financial difficulties within the company or some other problem.

Bachman contends that the injury to competition caused by Frito-Lay's TOP program is analogous to that found in *National Dairy Products Corp. v. Federal Trade Commission*, 412 F.2d 605 (7th Cir.1969). In *National Dairy*, the court reviewed a marketing program by Kraft Foods for the sale of fruit spreads in four marketing areas where Kraft's primary competition came from regional manufacturers. Under that program, retailers received a free case of fruit spread for every case purchased at regular price. The program was in effect for a 26-day period in 1961. The effect of the program was that the net price per unit was substantially below manufacturing cost. The cost of the promotional program was subsidized with profits earned outside the four marketing areas. The trial court found, and the Court of Appeals affirmed, that this was price discrimination in violation of the Clayton Act. The defendant argued that because of the short duration of the program, its effect could be nothing more than a temporary shifting of sales. However, the court found otherwise and adopted the reasoning of the FTC:

> It is obvious that the seriatim use of promotions or the use of a single promotion whose impact or design extends over a significant period of time can have as devastating an effect on market structure as any overt price cut which frequently is also of a temporary nature and certainly has no inherent sustained duration.

*Id.* at 616, quoting the Commission.

*National Dairy* is distinguishable from this case in several significant respects. First, because of the long shelf life of fruit spreads, the product at issue in *National Dairy*, the defendant could glut the market with its product. Retailers were able to stockpile during the period of the program, and sell the durable fruit spread at another time, thereby expanding the impact of the promotion well beyond its actual duration. In addition, the court found that the defendant's competitors were unable to compete financially because they could not meet the defendant's low price. Finally, the defendant chose to push its products only in the four strategic areas where its sales were weakest. As opposed to the marketing scheme in *National Dairy*, Frito-Lay's program was nationwide, although allegedly limited to large retailers, and the

**3.** Bachman alleges that the TOP program caused a substantial reduction in the amount of shelf space available to it in the Northeast and to other competitors nationwide (¶ 120). Based on Nielsen reports, it claims that it lost $380,000 in the Boston and New York areas in August through November of 1983 compared with the same period in 1982 when the TOP program was not in effect; that it suffered a decline in market share of 6.66% as compared with the same period in 1982, whereas it had an increase of 16.82% of the market share in the New York area where the TOP program was not yet instituted; and that its dollar sales in the New York and Boston areas rose an average of 2.45% in August through November 1983 as compared to the same period in 1982, when its sales in New York increased by 20.38% (¶ 121). It also alleges that in eight stores in one supermarket chain its shelf space was reduced in 1983 from an average of 10.6 feet to 3.16 feet per store with a substantial drop in sales volume over the comparable period in 1982 (¶ 122).

product involved was of a perishable nature so that glutting the market or stockpiling by retailers would only lead to an increase in the number of "stales," and result in additional expense to Frito-Lay. Moreover, Bachman has not alleged that it was unable to compete financially with Frito-Lay's program through a marketing program of its own.

■ Because of the limited duration of the TOP program, the fact that defendant has not alleged that Frito-Lay obtained a greater share of shelf space than its sales warranted, and the fact that dealers were free to drop out of the program or not enroll in it at all, leaving Bachman free to introduce its own competitive scheme, it is very difficult to see how the agreements between Frito-Lay and their retailers could constitute contracts in restraint of trade within the meaning of Section 1 of the Sherman Act. Even if defendant were able to show that Frito-Lay misled customers by misrepresenting volume of sales in an attempt to obtain a greater share of the market than actual sales figures would have entitled it to, defendant has still failed to allege facts that show an injury to competition. Defendant's only allegation regarding the effect of the TOP program on competition is the conclusory statement that it caused a substantial reduction in the shelf space available to other competitors nationwide. The facts alleged in defendant's counterclaim under Section 1 of the Sherman Act are not sufficient to state a claim of antitrust injury. Therefore, plaintiff's motion to dismiss defendant's fourth counterclaim is granted.

### Section 2 of the Sherman Act: Monopolization—Fifth Counterclaim

For its fifth counterclaim, Bachman claims that the TOP Program constituted unlawful monopolization. Bachman contends that through profit guarantees to those retailers for whose orders Frito-Lay faced its most effective competition, Frito-Lay subsidized the exclusion of competitors, thereby injuring competition without increasing efficiency, in violation of Section 2 of the Sherman Act.

Section 2 of the Sherman Act provides in pertinent part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

Frito-Lay attacks Bachman's monopolization charges on three grounds. It claims that Bachman has failed to define both the relevant product market and the relevant geographic market, and that Bachman has failed adequately to allege the existence of Frito-Lay's monopoly power. To state the offense of monopolization under Section 2, Bachman must allege that Frito-Lay possesses monopoly power in the relevant market and that Frito-Lay wilfully acquired or maintains that power, as distinguished from its growth or development as a consequence of a superior product, business acumen or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

In order to determine whether Frito-Lay possesses monopoly power, the relevant market first must be defined. In *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed.2d 1264 (1956), the court noted that "[i]n considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *Id.* at 395, 76 S.Ct. at 1007. In other words, "[d]etermination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another." *Id.* at 393, 76 S.Ct. at 1006.

Bachman argues that the relevant market in this case is salted snack foods, and that corn chips constitute an appropriate submarket. A single product will only qualify as a submarket when it is so unique

and dominant in the market that there is no practical substitute. *Borden, Inc. v. Federal Trade Commission,* 674 F.2d 498 (6th Cir.1982). Bachman contends that the salted snack food market includes, but is not limited to, in both salted and unsalted form, corn chips, tortilla chips, potato chips, cheese puffs, pretzels and popcorn. Frito-Lay contends that the product market must include other products such as "crackers, cookies, cheese, fruits, pizza, celery stalks, pickles, breadsticks, ice cream, brownies, deviled eggs and bagels." (Plaintiff's Memorandum at 25–26).

Under the theory of cross-elasticity or interchangeability, closely related products that may be substituted for each other constitute the same product market. Applying this test, I find that Bachman has adequately defined the relevant market in its fifth counterclaim.

■ The products described by defendant all have a number of characteristics in common. They are all ready-to-eat snack foods that require no more preparation than the opening of a package. This distinguishes them from several of the products that plaintiff claims are interchangeable and within the relevant market, such as celery stalks and deviled eggs. Salted snack foods, as defined by defendant, are also nonperishable, and require no heating or refrigeration. This distinguishes them from cheese, pickles and ice cream. Moreover, were a consumer to go to the supermarket for a bag of pretzels and find that the store was out of stock for this item, it is unlikely that he or she would decide to buy fruit or bagels instead. It is much more likely that the customer would substitute potato chips or corn chips. Similarly a rise in the cost of bagels is not likely to have any impact on sales of potato chips. Finally, all of the products defendant lists are within the same price range and could easily be substituted for one another. While Bachman bears the burden of proving the boundaries of the relevant market, "[R]ule 8 does not require that a plaintiff 'define specifically the boundaries of its purported market.' ... Questions of market definition can be narrowed and deter-

mined through the discovery process." *Minpeco, S.A. v. ContiCommodity Services,* 552 F.Supp. 327, 331 (S.D.N.Y.1982).

Defendant asserts that within the market of salted snack foods, corn chips is a proper submarket. Obviously, defendant is eager to have the court recognize a submarket in this case, because, according to defendant, Frito-Lay controls approximately 80% of this submarket when corn chip and tortilla-chip products are considered together. Bachman argues that the ingredients of these products and the machinery required to produce them are so unique that corn chips should qualify as a submarket within the salted snack food market.

■ The existence of a submarket may be determined "by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the products's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). Upon consideration of these factors, I do not believe that corn chips constitute a true submarket. While defendant alleges that corn chips are made of unique ingredients and that unique production facilities are required to make them, the same could be said about each product in the salted snack food market. What seems more significant is that corn chips are not sufficiently distinguishable from other salted snacks to have distinct customers and uses. *Borden, Inc. v. Federal Trade Commission,* 674 F.2d 498 (6th Cir.1982), which defendant cites in support of its submarket definition, is not to the contrary. In *Borden,* the court upheld the Commission's finding that processed, bottled lemon juice was not reasonably interchangeable with fresh lemon juice and, therefore, constituted an appropriate submarket. The Commission had found that low cross-elasticity of demand existed between bottled lemon juice and real lemon juice. What defendant would have to show here is that corn chips are not reasonably interchangeable with other salted snack

foods. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). Since I find that the facts alleged by defendant do not qualify corn chips as an appropriate submarket, defendant must state a claim of monopoly power in the salted snack food market.

■ Once the relevant product market has been established, the relevant geographic market must be identified. Defendant's contention that the entire United States constitutes the relevant geographic market is a logical one since Frito-Lay distributes throughout the United States. Moreover, the TOP program was a nationwide promotional campaign with, according to defendant, nationwide anticompetitive consequences. Although plaintiff disputes defendant's market definition, a national market is consistent with the definition of geographic market that plaintiff cites, "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961).

The final inquiry is whether defendant has alleged that plaintiff possesses monopoly power in the relevant market. It is on this point that I have the greatest difficulty with defendant's monopolization charges. In paragraph 152(ii) of the Answer, defendant alleges that as of 1980, plaintiff controlled 50% of the salted snack food market. Defendant also alleges that plaintiff's market share had increased from 47% of national sales in 1979. But the activities Bachman complains of did not occur until 1983. The purpose of section 2 is to prevent "pernicious market structure in which concentration of power saps the salubrious influence of competition." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). The counterclaims contain no information regarding Frito-Lay's monopoly power at the time of the TOP program or at any time following the TOP program.

The second problem with the allegation contained in paragraph 152(ii) of the Answer is that the 50% of national sales is based on a total sales figure of $2.4 billion. However, in paragraph 66 of the same Answer, defendant alleges that the "total national market for salted snack foods was $4.527 billion." If Frito-Lay's market share is calculated using the larger figure, it would fall far below 50%.

■ Market share evidence alone does not dictate the outcome in determining monopoly power. Such evidence is to be given weight but not conclusiveness. *Broadway Delivery Corp. v. United Parcel Service, Inc.*, 651 F.2d 122 (2d Cir.) *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), citing *United States v. Columbia Steel Co.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). In *Broadway Delivery, supra*, the court noted that in guiding a jury,

> [s]ometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share about 70% is usually strong evidence of monopoly power.

*Id.* at 129. But the court also rejected a jury instruction that precludes a finding of monopoly power if the defendant's market share is less than 50%. *Id.* at 130. On the other hand, in *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832 (2d Cir.1980), the court held that plaintiff's Section 2 claims were properly dismissed when defendant's market share at the time the complained of behavior began was 48.3%, and its share had declined continuously thereafter to only 33%: "These estimates of market share are not sufficient evidence to make out a claim of unlawful monopolization." *Id.* at 841.

■ At the oral argument of this motion, defendant conceded that its two sources for total sales of salted snack foods in 1980 were inconsistent, and that it did not yet have sufficient information to determine which of the figures was accurate. However, defendant argues that Frito-Lay's power to exclude competition when coupled with its market share is sufficient to show that Frito-Lay wielded monopoly power. It

would be premature to dismiss defendant's monopolization claim at this time.[4] Whether monopoly power actually exists is a question of fact to be determined from whether the plaintiff "can control prices or exclude competition." *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Defendant has alleged specific conduct on the part of Frito-Lay which was calculated to acquire and maintain monopoly power. Although defendant will have to substantiate its claim of monopoly power in order to succeed at trial, the monopolization claim is sufficient to withstand the motion to dismiss. *See Brager & Co., Inc. v. Leumi Securities Corp.*, 429 F.Supp. 1341 (S.D.N.Y.1977), *aff'd*, 646 F.2d 559 (2d Cir.1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981).

*Section 2 of the Sherman Act: Attempted Monopolization—Sixth Counterclaim*

For its sixth counterclaim, defendant alleges that Frito-Lay's attempt to exclude its most effective competitors from valuable shelf space through the exercise of its market power constitutes attempted monopolization in violation of the Sherman Act. To state a claim of attempted monopolization, the defendant must allege facts which show that there is a dangerous probability of monopolization and the specific intent to destroy competition. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953).

■ For the reasons discussed in the previous section, the claim of attempted monopolization is sufficient to withstand the motion to dismiss.

*Sections 2(a) and 2(d) of the Robinson-Patman Act—Seventh Counterclaim*

Defendant alleges that the TOP program was a form of unlawful price discrimination in violation of Sections 2(a) and 2(d) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (d) (1982). Defendant claims that by offering profit guarantees to large supermarket chains only, Frito-Lay engaged in price discrimination that injured competition.

Section 2(a) of the Robinson-Patman Act provides, in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers or commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce or to injure or destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

15 U.S.C. § 13(a).

The Supreme Court has noted that "[s]ellers may not sell like goods to different purchasers at different prices if the result may be to injure competition in either the sellers' or the buyers' market unless such discriminations are justified as permitted by the Act." *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 702, 87 S.Ct. 1326, 1335, 18 L.Ed.2d 406 (1967). The price discrimination in this instance consists of Frito-Lay's failure to make the TOP program profit guarantee available to all of its customers. Bachman asserts that Frito-Lay discriminated by targeting only a particular type of customer. The allegation that Frito-Lay restricted eligibility for the profit guarantee to large supermarket chains by presuming a non-existent parity between sales and shelf space in small grocery stores states the first element of price discrimination. *See, e.g., Gemini Supply Corp. v. Zeitlin*, 590 F.Supp. 153 (E.D.N.Y.

---

**4.** The status of defendant's antitrust discovery is unclear. In an earlier motion by defendant to amend his complaint, defendant indicated in its moving papers that its discovery on the antitrust issues was nearly complete although plaintiff's had barely begun. However, at oral argument on this motion, defendant noted that there were several aspects of its case that required further discovery. Accordingly, I am giving defendant a final opportunity to gather sufficient evidence to support its claims under the fifth and sixth counterclaims.

1984). However, defendant fails to allege sufficient facts to state a claim of competitive injury.

An allegation of competitive injury under Section 2(a) of the Robinson-Patman Act can be sustained by a showing of either injury to competition at the seller's level or the existence of the seller's predatory intent from which injury to competition can be inferred. Bachman contends that it has sufficiently alleged Frito-Lay's predatory intent to survive Frito-Lay's motion to dismiss.

Price predation consists of the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market with the idea that losses will be recouped later through higher profits gained in the absence of competition. *Northeastern Telephone Co. v. American Telephone & Telegraphic Co.*, 651 F.2d 76, 86 (2d Cir. 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). In addition, predatory intent can be inferred in certain circumstances from the existence of below-cost pricing. *See Utah Pie Co. v. Continental Baking Co.*, 386 U.S. at 696 and n. 12, 87 S.Ct. at 1332 and n. 12.

In this case, the counterclaims contain no allegation that the effect of the profit guarantee was that Frito-Lay was selling to participants of the program at below-cost prices. Bachman's sole allegation in this respect is that the TOP program cost Frito-Lay more than one dollar in expenses for each additional one dollar of sales realized from the extra shelf space (Answer ¶ 118). The only loss by Frito-Lay that Bachman alleges is on the incremental shelf space added during the TOP program. Bachman does not claim that in those supermarket chains where the profit guarantees were in effect, Frito-Lay was selling its products below cost. Nor does it claim that the TOP program was unprofitable. In *Utah Pie, supra*, on which defendant relies, the court stated that "the evidence shows a drastically declining price structure which the jury could rationally attribute to continued or sporadic price discrimination," *id.* at 703, 87 S.Ct. at 1336, and from which the jury could reasonably conclude that its effect

was substantially to lessen or destroy competition. "The statutory test is one that necessarily looks forward on the basis of proven conduct in the past." *Id.*

■ Unlike *Utah Pie*, there is no allegation here of declining price structure in the product market, or of exclusion of any competitor from any particular market or even from any particular supermarket chain. I find that defendant has failed to allege sufficient facts to state a claim of price predation under the Robinson-Patman Act. Accordingly, plaintiff's motion to dismiss the seventh counterclaim, insofar as it relates to defendant's claim under Section 2(a) of the Act, is granted.

Defendant also seeks to assert a claim under Section 2(d) of the Robinson-Patman Act. Defendant contends that the benefits of the TOP program were not available to Frito-Lay's customers on proportionately equal terms. Section 2(d) provides:

It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d). Plaintiff claims that Bachman does not have standing to raise alleged violations of Section 2(d) since the purpose of that section is to prevent discrimination at the customer level.

Bachman relies on *Morris Electronics of Syracuse, Inc. v. Mattel, Inc.*, 595 F.Supp. 56 (N.D.N.Y.1984), as support for its right to seek damages under Section 2(d). In *Morris Electronics*, plaintiff, a wholesaler of Mattel toys, claimed that Mattel gave promotional benefits to its large retailers that were not available to retailers purchasing from plaintiff. In a suit against Mattel

for damages for lost sales and profits, the court held that there was a sufficiently close connection between the violation alleged and the injury suffered to give plaintiff standing to assert a violation of Section 2(d).

■ Bachman has no such close connection with the customers of Frito-Lay that were excluded from the TOP program. The Supreme Court has noted, in discussing the scope of Section 2(d), that "the competition with which Congress was concerned in § 2(d) was that between buyers who competed in resales of the supplier's products." *Federal Trade Commission v. Fred Meyer, Inc.*, 390 U.S. 341, 356, 88 S.Ct. 904, 912, 19 L.Ed.2d 1222 (1968). Bachman does not fall within the class of individuals that Section 2(d) was intended to protect. Therefore, plaintiff's motion to dismiss defendant's seventh counterclaim is granted.

### Section 7 of the Clayton Act—Eighth Counterclaim

For its eighth counterclaim, Bachman alleges that the securing by Frito-Lay of exclusive use and possession of supermarket shelf space through the TOP program tended to lessen competition in violation of Section 7 of the Clayton Act. Frito-Lay contends that Section 7 proscribes certain permanent horizontal business combinations and is intended primarily as a means of policing mergers that may have a harmful effect on competition and, therefore, it is not applicable to defendant's claims.

Section 7 of the Clayton Act provides, in pertinent part:

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be sub-

stantially to lessen competition, or to tend to create a monopoly.

No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

■ Section 7 is "intended 'primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil....'" *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 485, 97 S.Ct. 690, 695, 50 L.Ed.2d 701 (1977), quoting *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957). In its attempt to bring its claim within the scope of Section 7, defendant relies on the broad definition of the terms "acquire" and "asset" set forth in *United States v. Columbia Pictures Corp.*, 189 F.Supp. 153 (S.D.N.Y.1960). In that case, the court stated:

[T]he words "acquire" and "assets" are not terms of art or technical legal language. In the context of this statute, they are generic, imprecise terms encompassing a broad spectrum of transactions whereby the acquiring person may accomplish the acquisition by means of purchase, assignment, lease, license or otherwise....

The statute imposes no specific method of acquisition. It is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and the proscribed adverse "effect."

\*  \*  \*  \*  \*  \*

As used in this statute and depending upon the factual context, "assets" may mean anything of value.

189 F.Supp. at 181–82. Even under these broad definitions, the allocation of additional shelf space to Frito-Lay for the duration of the TOP program cannot constitute the acquisition of an asset in violation of Section 7.

*Section 43(a) of the Lanham Act—Third Counterclaim*

For its third counterclaim, defendant alleges that plaintiff misrepresented its share of the market to "retailers" in order to secure additional shelf space, in violation of Section 43(a) of the Lanham Act. Section 43(a) provides, in pertinent part:

Any person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin ... or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a).

In its effort to stretch the Lanham Act, defendant relies on two decisions from outside this circuit. In *Walker-Davis Publications, Inc. v. Penton/IPC, Inc.,* 509 F.Supp. 430 (E.D.Pa.1981), the publisher of a controlled circulation magazine sued a competitor claiming that the competitor's misrepresentation of its circulation and the nature of its audience had misled advertising buyers, and thereby caused the plaintiff to lose revenues from the sale of advertising. The court found that Section 43(a) was applicable, but that proof that advertising buyers had actually been misled was an essential element of the claim. In *In re Uranium Antitrust Litigation,* 473 F.Supp. 393 (N.D.Ill.1979), the court refused to dismiss a counterclaim that plaintiff's misrepresentation to its customers of the quantity of uranium it could supply

violated the Lanham Act. The court refused to apply the "inherent qualities" test on the ground that it would be impossible to misrepresent the inherent qualities of uranium. The court also noted that:

[W]e believe that the Act should be read, at minimum, to protect competitors from misrepresentations which a defendant makes about its own products and which relate to the principal bases of competition among sellers. These types of misrepresentations are likely to have direct and major impact in diverting sales to the defendants, which is the same effect as that which is produced by trademark misuses and by related conduct which trades on the goodwill of a competitor.

*Id.* at 408–409.

In *Fur Information and Fashion Council, Inc. v. E.F. Timme & Son, Inc.,* 501 F.2d 1048 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974), the court stated that the Lanham Act "was intended to apply only to misrepresentations relating to the inherent qualities of defendant's own goods." *Id.* at 1051. Frito-Lay argues that the "inherent qualities" test is the law in this circuit, and only where the misrepresentations concern product characteristics will a violation of the Lanham Act be found. *See, e.g., Coca-Cola v. Tropicana Products, Inc.,* 690 F.2d 312 (2d Cir.1982).

Not only does the "inherent qualities" standard exclude Bachman's third counterclaim, but even the two decisions on which Bachman relies do not strain the Lanham Act to include Bachman's counterclaim in this case. In both cases, customers were alleged to have been misled about the quantity or the characteristics of the seller's product. In this case, there is no allegation that the retailers to whom the alleged misrepresentations were made were in fact deceived. On the contrary, the misrepresentations that defendant alleges in this case relate to a particular supermarket's own volume of sales of Frito-Lay products, rather than to any characteristic of the product itself. Each supermarket had the knowledge and information within its own records to confirm or reject the

representation Frito-Lay made to it, if it considered the data material. Therefore, even under a broad reading of the Lanham Act, defendant's third counterclaim fails to state a claim on which relief can be granted.

## Conclusions

For the reasons discussed above, plaintiff's motion to dismiss defendant's counterclaims is granted with respect to the fourth, seventh, eighth and third counterclaims, and denied with respect to the fifth and sixth counterclaims.

SO ORDERED.